Case number 19-2266. Definka Stojcevski v. Macomb County MI et al. Oral arguments not to exceed 15 minutes per side. Mr. Eric J. Tomberg for the appellants. Good morning and may it please the court. Eric Tomberg for the appellants, Macomb County and the individual Macomb County corrections officers. With the court's permission, I have reserved five minutes for rebuttal. Yes. David Stojcevski's death at the Macomb County jail in 2014 was a tragedy. In retrospect, it's clear he was in need of further medical attention to treat his drug withdrawal that he simply did not receive. However, that does not mean that the corrections officers at the jail were deliberately indifferent to his condition, such that they committed a constitutional violation of the Eighth Amendment in Section 1983. This circuit has held... Can I ask you, just starting off, kind of to narrow the range of debate. Do you, you don't dispute, do you, that it's clearly established that drug withdrawal is a serious medical need for purposes of the objective test? We're not disputing that in this... Okay. And then, and then, so that switches to the subjective and I, you could either say it's two separate parts or just one part within this objective. One is that you have to subjectively know of the serious medical need and then two is that you unreasonably respond. I take your argument that is that you did, the officers did subjectively know, but they reasonably responded because they got the medical personnel involved. Yes, I think that's fair to say. Okay. So then the range of debate here is only over whether there was a reasonable response to what the officers would have recognized by watching the video to be a serious medical need. I think that's fair. I mean, I don't know that the record, you know, shows that the officers could have diagnosed exactly, you know, what was going on, obviously with, with Mr. So what do you, we're supposed to take this officer by officer, right? 1983 is, there's no vicarious liability. One officer can't be liable for another officer's actions. I went through the depositions of the officers. And so I would, I would categorize them into two parts. Three officers recognized, remembered the plaintiff and remembered getting medical help. But four of the other officers, it's not at all clear that they actually did anything. So it seems to me that there, there's, there could be at least a dispute of fact with respect to those officers who do not even remember the decedent. Because as you can see, just watching the video, you can see a serious medical need and they couldn't remember the decedent. So there's no telling what actions the individual officers took. And you know what four I'm talking about. I assume you know the record just as well as I do. Yes. I take your point. I would say I would draw the distinction between, you know, the officers not remembering Mr. Stachewski or remembering exactly how they responded. And then how they may have actually responded in the moment. Obviously, I think they see, you know, dozens or hundreds, if not more, detainees. And the depositions were obviously well after the incident. So I would, I would push back on whether that means that there's necessarily a question of fact. I think the record shows, you know, how they responded insofar as they occasionally called for medical aid, you know, when they felt that there was a need. But the fact that a given officer on a given time period did not call for aid, I don't think that that means that they that there's a question of fact. So you're accepting the facts as shown on the video? Yes, we're not disputing the video. But I do do have some comments on the video, if I may. No, I'm curious. You know, one of our questions always is jurisdiction. Are you accepting the facts of as stated by the plaintiff, and there is this video that goes on for days with with the decedent, obviously, in dire straits, and I'm just curious whether you're disputing any of those facts. We're not disputing the facts of the video. No, I mean, we are disputing the view of what the video means in terms of the subjective deliberate indifference, or lack thereof, of the officers. And I think Your Honor's hinting at the jurisdictional argument, one of the jurisdictional arguments that the plaintiff has raised, whether we are obligated to concede the facts and what that means in the context of the video. So our position is that we're not disputing any of the facts. The video shows what the video shows. You know, it seems that you are disputing the facts pertaining to how inadequate, factually, the nurses' attention and assessments of the decedent's situation was. It seems as though, as I understand what you're saying here, you have a response to the argument that once the officers called the nurses' attention to the medical condition of the decedent, that they had fulfilled their responsibilities. And the counterargument is that the decedent's condition was so medically compromised that they should have known that more needed to be done. And your position, on the other hand, takes issue with that, particularly as to what the officers could see that the nurses were doing or not doing to medically assist the decedent. And what seems to be clear is that he was a prostate on the floor for two or three days in distress, and nothing adequately was done in that time frame. And as to whether something should have been done and the defendants should have known something should have been done, there are factual disputes that go to that point. And you're not really conceding the factual version of what happened as set forth by the plaintiff here. So it would appear that there is a serious jurisdictional issue as to whether you should even be bringing this appeal. How would you respond to that? Sure, Your Honor. I would use the example of, in one case, Officer Cooney, one of the defendant corrections officers. He called for nurses. And after he observed Mr. Staszewski shaking on the ground, nurses arrived and examined him and told him that he was detoxing and that this type of behavior was a regular occurrence for him. And then, you know, they left. The officers were the reasonableness in inquiry into the reasonableness of their response is appropriate for this court to consider, even if the district court believed that it was unreasonable. We think that the facts, you know, the facts show what the officers did in response. We do obviously disagree that the court should do that. It's unreasonable. But we believe that this reliance, based on examples like that, what was acceptable or does not rise to the level of deliberate indifference. Well, he was talking about the jurisdictional argument. What about you also are trying to bring in the Monell claim through the pendant jurisdiction? Before he goes to that, did that complete your answer on the jurisdictional issue? Well, Your Honor, I would also add that, as was mentioned in the recent response to the additional authorities that plaintiffs submitted, we don't believe that the opponents are obligated to concede that view. And we don't believe that we are required to show that the district court's views were utterly discredited or blatantly or demonstrably false. So I would just add that to the statement. I know we've seen your yellow card, but Judge Murphy has a line of questioning that is important to the case as well. I was just going to ask because it was about jurisdiction. So I guess the theory of pendant jurisdiction, as I understand it, is if the qualified immunity claim fails, then the Monell claim fails as well. And so that's why you can bring a Monell claim down. But it does seem like the district court's Monell opinion was not just tied to these particular officers. It was also tied to the theory that the private medical personnel, the county could be responsible for the care that was provided by the private medical personnel. And that Monell theory, if accurate, is completely separate from the qualified immunity of these corrections officers. So I guess I question why pendant jurisdiction would exist when qualified immunity for the officers wouldn't necessarily resolve the Monell claim. Right, Your Honor. So the rule, and I'll speak briefly, I know I'm over my time, is that the county's bill must be inextricably intertwined with that of the officer's appeal. And there is a claim that there was inadequate training of the officers by the county. We think the county's claim here is different than some of those cases that find, like the McGaugh case, which found that the officers were entitled to rely but held that the county's claim there was no jurisdiction over it because it was different. We think it's a different scenario here, even though there is a failure to train claim, because the county did train the officers on record shows that even the district court's opinion cites to the officers understanding that there were symptoms of withdrawal happening. They're recognizing that. So they just decided to defer to the medical staff based on some of those statements that I've stated earlier. So we think that if the court finds that the officers were entitled to defer to the medical staff, then the county can't be liable on the related failure to train. And so I was intertwined with that drug withdrawal question. Thank you. Is your time up now? Can the clerk tell us? Yes. Okay. So you wanted to save time for rebuttal, and that will be fine. And we will hear from Mr. Erie. Am I mispronouncing your name? Sorry. Pronouncing it correctly. It's just like the lake only a little bit. I may please support honorable panel. With respect to the issue that I would like to address for the jurisdiction. We do not believe that that is conceded the facts and the light most favorable in this matter. For example, I don't think that they have conceded the facts that in the last five days of David's life, he was only seen by medical person for approximately two and two minutes and 50 seconds. But the district court in this matter, who, according to her opinion, it appears as if she viewed the video in this matter. She came to the conclusion that there were a number of issues of fact, and the primary issue of fact is whether or not the deputies, each of which according to the opinion, were extremely close to the defendant. Either they were watching a monitor for their eight hour shift that was directly into his cell, or they were a runner, which means that at least once an hour, they would go look into his cell and see how he was doing. They had multiple shifts. Each one of the deputies had multiple shifts where they had an opportunity to see David. The defense that once we share or request information or call up a medical personnel, we can wash our hands of the situation is not a valid defense under the case law. And even if it were a valid defense for the last several days of David's life, the days in which he was spiraling down and deteriorating, there is no doubt because the video shows it that no medical person was called. No medical person saw David. He died on the 27th of June. No medical person saw David on the 22nd, on the 24th, on the 26th, or on the 27th, the nurse that came in after he was found non-responsive and deceased. I frankly think it is clearly established that we said in McGaugh, cases in this and other circuits demonstrate that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professional's opinions. And there is some deposition testimony of at least three of the officers where they say things like, every time I talked with the nursing staff, they said he was okay. That's Paul Harrison's deposition. And I was assumed he was okay based on their diagnosis and what information they gave me. So there is some evidence to support the notion that these officers did raise concerns based on the way he was acting in a cell that medical personnel responded. Some of them even thought that he was faking the seizures, but responded that he was otherwise okay. It does seem reasonable to me for non-medically trained officers to rely on those responses. So how would you respond to like that deposition testimony from Harrison and a couple others? It is a reasonable position for the defendant to take under certain circumstances, but respectfully, not under these circumstances. First of all, when a medical person is called, they see a situation at a point in time. One minute, one hour, two hours after that, circumstances can change and do change or to defer to at least in his last days, as I said, on June 22nd, 24th, or 26th. And there was no evidence that any of the deputies called medical when he was clearly spiraling down. Now, when I use the phrase clearly spiraling down, it is true that someone else may look at that video and disagree with me. But therein lies the question of fact as to A, whether or not what the deputies saw should have caused them to call medical, which they didn't on the days I cited, or whether or not if they did call medical, whether they were reasonable in relying upon the advice to the extent that they received any of medical. The Sixth Circuit has in the past indicated and I would say that I quote, it is permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. And it is our position that these deputies indeed, simply by their proximity to data, what was seen on the video had, were not reasonable in A, deferring to medical or B, that they should have taken steps to deal with what was clearly a serious medical condition that was not being tended to. I agree with you on the spiraling down and then the need to reassert you can't rely on indications of the patient is okay from medical if circumstances change. What is your best view of the evidence of what that spiraling down looked like? Because when I compare the videos, say from this 18th, 21st to the day that he died, the shaking did not seem to me to be all that different. And so I wonder if you could specifically articulate things that support the notion that he was spiraling down. Well, first of all, the district court found that he was deteriorating during those days. It's interesting that the dates that you cite, the 18th to the 21st, seemed to be the days that he got the most medical attention. And it was the days after the 21st that as he was getting worse, medical attention got to be less, if you will, spiraling down is that I would point to in response to your question would be lethargy that caused him for in excess of 50 hours to be lying down, essentially non-responsive. The fact that mental health personnel even concluded themselves all of the days from the 22nd thereafter and even before that he was not responsive, they indicated in their notes, they called it refused to interact. But the fact of the matter is no mental health personnel ever assessed him. Also, he was having additional, I don't think I can say hallucination, because he was not responsive, but he was having more serious tremors. He was having more serious convulsions. He was having more serious physical responses that should have been identified by the deputies as they watched him. The deputies also knew that they were not contacting medical and medical was not seeing him during those past five days, except for a very time. Was there also not a lack of eating on his part that he ate virtually nothing during the entire time he was there and also apparently dehydration? He was not eating for the entire 10 days he was in the high observation unit. He had a grand total if he ate at all of three meals out of 10 days. The county did not monitor him. The deputies did not monitor him. The final diagnosis of the coroner medical examiner was that he'd suffered from hypernatremia. Hypernatremia is a condition that is a result of dehydration. And while the defendants were quick to point out that his hypernatremia was not identified by the medical examiner as the cause of death, it was her final day, part of her final diagnosis. And it's our position that that's certainly hastened and assisted if you will, in his death. And was there also not evidence that he lost something like 44 pounds during the time that he was there? He was weighed upon entry of the jail and there was a, we've indicated in our paperwork that it was a 40 pound loss. But if you look at the actual numbers, it actually was a 45 pound loss, which is not surprising because he was not eating. And keep in, I would ask the court to keep in mind, he actually was on a suicide cell. And you know, if I want to kill myself without a sheet, all I have to do is stop eating and drinking. So even though this is not a suicide case, that really was an additional incentive for the deputies who believed he was in a suicide cell for them to take special care to observe and monitor his food intake and his water intake, which was not done, nor were they ever trained to do so, according to the deputies. So on the jurisdiction issue, we would ask the court not to take jurisdiction of this matter. There are numerous questions of fact. It is not sufficient to hand an inmate off to medical and essentially leave him alone at this point. If I might, I would like to move toward the issue of county liability. We believe that the county should remain in for two reasons, as did the District Court Judge Parker. Number one is that it is clear from testimony of Sheriff Wickersham, that even though he knew that he was in charge of the medical care of inmates, he turned the entire responsibility over to the privately contracted for company CCS. He testified that he accepted that he was still responsible for it, but they never checked on what were the policies, how were the policies of CCS being implemented. And I think that Judge Parker is correct when she said that essentially makes the argument, if you will, gives the opinion that if a county completely turns over the responsibility of medical care for an inmate to a privately contracted company, and that company drafts their policies and procedures and becomes responsible for the training of their own employees, that once that responsibility is totally turned over to the private contractor, that the policies, procedures, and training or lack of training become those of the county. And we would ask the court to adopt that position. Number two, the county itself has a responsibility to train its deputies, and it failed to train its deputies. And that is our argument as to Monell liability, that they failed to train their deputies. A, they failed to train their deputies with respect to identifying benzodiazepine withdrawal. Obviously, counties at this point, including Macomb County have claimed that they are repositories for drug addicts. And it's a very common and foreseeable issue that those with benzodiazepine addictions will be their inmates. They were not trained to identify that. They also were not trained to monitor food and water intake. And the medical doctor at the jail testified that food and water intake is a part of medical care. And that he just assumed that they knew what they were doing with monitoring such, they were not trained to do so. They were also not trained as to when they ought not to rely upon the advice or determination of a nurse or medical personnel. They were not trained as to when it's reasonable to take steps over and above what a medical person may decide. But if we were to decide that the officers should remain in the case, because they have, there's been an adequate allegation of violation of the constitutional right, would we have jurisdiction over these manel claims? Well, our position is that we believe that they are, they are separate. And that the courts should not determine that the activities of the sheriffs are inextricably intertwined or with the deputies rather are inextricably intertwined with those of the county itself. So my answer to that question would be no. Thank you. I think I'm out of time. Thank you for honors. This was my first time arguing in front of the circuit court and it has been quite enjoyable. Thank you. It is a little bit different doing it on Zoom. So we look forward to the day of being able to be in Cincinnati again. Mr. Townsend, you have five minutes, I think. Yes. Thank you, Your Honor. I want to make a couple of points. First, starting with the, one of the earlier issues discussed by Mr. Geary. I would agree that if there is a then an officer can't necessarily rely on previous medical opinions. That was stated in a 2018 Sixth Circuit case, Barbaric, where the court held that absent circumstances, such as new and alarming symptoms, an officer is entitled to rely on the opinions of medical personnel. So... Well, doesn't that agreement show that there's a dispute of fact because the district court did say that there was a deterioration? Don't we have to, what do you make of that district court finding that at least there was a dispute of fact over whether there was a deterioration? Well, I guess, again, we would just draw the distinction between what the district court concluded based on the video footage and what the actual video footage shows. We think the video footage, that's the actual facts, you know, him lying on the ground for however many hours he did, that's a fact. But whether that shows a significant deterioration or spiraling downward, such that it should have alarmed the officers to realize the situation to change, that's, we don't think that that's necessarily true. But then doesn't, aren't you really saying there is a dispute of fact here? Because your opponents say it shows a spiraling down. The district judge felt it showed a spiraling down. You say it doesn't show a spiraling down. At best, there's a factual dispute. Well, we would just push back on that, Your Honor, a little bit. And again, you know, what I was going to say, I think is relevant, which is that one of the officers testified that in the mental health unit, the abnormal is normal. So this went into, you know, their subjective understanding of the situation at that time. For example, the record shows that the officers testified that inmates are often naked, often lying on the floor, lethargic, one of the conditions that Mr. Erie mentioned, not eating or drinking, sweating, shaking, going to the bathroom on themselves. These are, unfortunately, common conditions that these officers see. So when these, when this behavior occurred, Mr. Stashevsky, the officers would have known that and we don't think this was necessarily in a spiraling downward from them watching the video of that. With my remaining time, I'd just like to address one of the other arguments that Mr. Erie raised, which is that this argument that the policies of the vendor become the policies of the county when medical care is contracted out. We disagree with this principle being applied here. First, it's drawn from outside the Sixth Circuit. So those cases are not necessarily binding. But at the same time, we think that the principle is at odds with Sixth Circuit case law. For example, in Leach versus Shelby County, a 1989 Sixth Circuit case, the court rules that contracting out medical care does not excuse the county of its own duty to provide adequate medical care. We're not disputing that. We don't think that the county is insulated just by contracting out. But with respect to this Lonell claim, vis-a-vis the vendors, the medical people, we don't have the medical people in this appeal. So I don't understand how we could say that is inextricably intertwined with the officers here. I mean, I can understand the argument about the training of the officers. Arguably, I can understand the argument you're making about that being jurisdictionally available to us to consider. But I don't understand with vis-a-vis the medical people, the involvement of the medical people. I think that we would still, again, draw a line between the two. And we don't think that the medical entity not being involved precludes the court from making a finding on the Lonell claim. Because we think that it's still, what's still important is how the county responded, not what the medical provider did. For example, in the Leach case that I was about to discuss, the court held that the treatment of the plaintiff was deplorable and concluded it wasn't excused by reliance on the medical staff. And so, I think that the court the relevant point that I wanted to make is that the county was not liable per se, just by contracting out the medical care. Any liability would still just have to be based on the county and the officers' own actions. So, we think that distinction can be drawn successfully. I see that your red heart is up. So, it's a little hard with the Zoom, I'm noticing that. But thank you for your argument. Thank you. I think this concludes the argument. And we appreciate both of you being here on Zoom. And we will have the case be submitted.